IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JANIS O'CONNOR, | : | CIV NO. 1:22-CV-1607 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | (Magistrate Judge Carlson) |
| | : | |
| ELMER SNYDER,  et al., | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

I.    **Factual Background and Procedural History**

This is a strange case which comes before us for consideration of a motion to dismiss. (Doc. 31). The *pro se* plaintiff, Janis O'Connor, is an elderly individual and is reputed to be a former attorney who has been suspended from the practice of law. O'Connor's amended complaint makes sweeping claims of a RICO racketeering conspiracy involving a couple, Elmer and Lori Snyder, who engage in an equine boarding business. (Doc. 7). However, stripped of its rhetorical flourishes, the gravamen of this alleged federal racketeering conspiracy complaint revolves around disputes which are years old and involve the alleged loss of a broken generator, a disagreement over horse boarding fees, and the October 2018 disappearance of a kitten.

Moreover, some aspects of the amended complaint appear to entail matters that are more imagined than real. For example, the amended complaint indicates that O'Connor believes the defendants used aerial drones to record and monitor the movements of the plaintiff's kitten in October of 2018. (Id., ¶ 32). O'Connor also essentially alleges that the Snyders kidnapped this kitten in October of 2018 and held the feline for ransom, telling the plaintiff that unless she acquiesced in their demands, "you'll never see your cat again." (Id., ¶ 37). In addition, O'Connor implies that Mr. and Mrs. Snyder are engaged in some sort of years' long pattern of comprehensive electronic surveillance of the plaintiff which enables them to determine her whereabouts "24-7". (Id.) Further, it is evident on the face of the amended complaint that Ms. O'Connor has attempted to litigate these claims is other courts under other legal rubrics but to no avail. Thus, the allegations made in this pleading mirror those previously considered and rejected by state courts both in Pennsylvania and in Maryland.

The amended complaint, which guides our consideration of this motion to dismiss, indicates that Ms. O'Connor is an animal lover who has kept horses, a kitten, and a puppy. (Id., ¶¶ 13, 30-37, 48). The allegations in this lawsuit in large

measure stem from O'Connor's affinity for, and apparent inability to care for, these animals.[1]

According to O'Connor's amended complaint, in the Fall of 2017 she suffered a series of debilitating injuries which rendered her, at the age of 72, unable to care for her horses. (Id., ¶¶ 13-16). Accordingly, in early 2018 Elmer and Lori Snyder, who were casual acquaintances of the plaintiff, agreed to board O'Connor's horse on their property. (Id., ¶ 18). O'Connor asserts that she understood that the Snyders had agreed to undertake this equine boarding without compensation, a contention the Snyders have successfully disputed in state court. (Id.)

---

[1] As reflected in the attached table obtained from the Maryland courts' automated records, it is an undisputed matter of public record that O'Connor has been cited on numerous occasions by animal control officials for infractions relating to the confinement and care of her animals and particularly her horses:

| | |
|---|---|
| 110100000612010 | ANIMAL CONTROL DIVISION FREDERICK COUNTY vs O'CONNOR, JANIS MARIE |
| 110100000542006 | FREDERICK COUNTY ANIMAL CONTROL DIVISION vs O'CONNOR, JANIS |
| 110100006142012 | FREDERICK COUNTY ANIMAL CONTROL DIVISION vs O'CONNOR, JANIS |
| 110100006152012 | FREDERICK COUNTY ANIMAL CONTROL DIVISION vs O'CONNOR, JANIS |
| 110100006162012 | FREDERICK COUNTY ANIMAL CONTROL DIVISION vs O'CONNOR, JANIS |
| 110100007282015 | FREDERICK COUNTY ANIMAL CONTROL vs O'CONNOR, JANIS |
| 110100007302015 | FREDERICK COUNTY ANIMAL CONTROL vs O'CONNOR, JANIS |
| 110100014732005 | FREDERICK COUNTY ANIMAL CONTROL vs O'CONNOR, JANIS |
| 110100014742005 | FREDERICK COUNTY ANIMAL CONTROL vs O'CONNOR, JANIS |
| 110100014752005 | FREDERICK COUNTY ANIMAL CONTROL vs O'CONNOR, JANIS |
| 110100014762005 | FREDERICK COUNTY ANIMAL CONTROL vs O'CONNOR, JANIS |
| 110100014772005 | FREDERICK COUNTY ANIMAL CONTROL vs O'CONNOR, JANIS |
| 110100014782005 | FREDERICK COUNTY ANIMAL CONTROL vs O'CONNOR, JANIS |
| 110100028372016 | FREDERICK COUNTY ANIMAL CONTROL vs O'CONNOR, JANIS |

As the parties were making these animal boarding arrangements, O'Connor alleges that in early 2018, Mr. and Mrs. Snyder also removed a broken electric generator from her property. O'Connor avers that she requested the return of the broken generator, but the defendants never returned it to her. (Id., ¶ 17).

By April 2018, O'Connor alleges that the Snyders prevailed upon her to entrust additional horses to their care. (Id., ¶ 21). O'Connor grew suspicious of the motives of Mr. and Mrs. Snyder, who she feared were disposing of her horses and taking advantage of her difficult personal situation. Accordingly, in May of 2018 she demanded the return of the animals. When the Snyders refused to return the horses, O'Connor brought a replevin action against them in the Spring of 2018. (Id., ¶¶ 20-29). This replevin suit was later transferred from state court in Maryland to the Court of Common Pleas of Adams Count. (Id., ¶ 29). According to court records tendered by the defendants, whose authenticity has not been challenged, in November of 2018 the state court declined to issue of writ of seizure in favor of O'Connor compelling the return of these animals. (Doc. 32, Ex. 6). The state court reasoned that Mr. and Mrs. Snyder were entitled under state law to retain possession of the animals because O'Connor had not paid outstanding boarding fees.  Further, by May of 2023, the state court entered a judgment in favor of the defendants in this replevin action. (Id., Ex. 7(A)). Thus, the state courts have rejected O'Connor's claim that she has a legal right to regain possession of these animals.

4

Pennsylvania court records also indicate that Mr. and Mrs. Snyder have obtained judgments in their favor on their claim that O'Connor owes them outstanding boarding fees. (Id., Exs. 8 and 8(A)). Finally, Pennsylvania court records rebuke O'Connor's claims that she has some entitlement of access to these horses in yet another way. In 2020, O'Connor was convicted in state court of trespassing on the Snyders' property, the state court having rejected her claim that "she had a right to see her horses" and search the Snyders' property for her missing kitten. On appeal, the Pennsylvania Superior Court affirmed O'Connor's trespassing conviction. Commonwealth v. O'Connor, 264 A.3d 361 (Pa. Super. Ct. 2021).

As O'Connor pursued what was ultimately an unsuccessful replevin action, in September of 2018 she alleges that she purchased a kitten from a breeder in Europe. (Doc. 7, ¶ 30). According to O'Connor, shortly after she purchased this kitten:

> One afternoon in mid-October 2018, Snyders suddenly appeared in plaintiff's neighborhood. Standing on a neighbor's lawn, they began flying a drone low over plaintiff's property. They refused to stop, and only left when ordered to after the police were called. Plaintiff's kitten was outside with plaintiff at the time of the incident and was no doubt seen by defendants in the video taken by the drone.

(Id. ¶32).

O'Connor believes that the drone video surveillance of her kitten was merely the prelude to a kitten kidnapping undertaken by the Snyders in October of 2018. Moreover, O'Connor asserts that the defendants kidnapped her kitten as part of a broader extortion plot designed to force her to withdraw her replevin suit. (Id., ¶¶

33-34). Ultimately, O'Connor avers that this plot came to a head in late October 2018 when:

> [P]laintiff was waiting in front of the Thurmont, Maryland, library for the Sheriff's deputy to arrive and take plaintiff's report of the cat's theft. While plaintiff was waiting, Elmer and Lori Snyder, Pennsylvania residents, suddenly appeared and approached. Plaintiff was thoroughly shocked, and immediately asked Elmer Snyder how he came to the library. Snyder replied, "I know where you are 24-7." Elmer Snyder then displayed a cell phone on the screen of which was a photo of plaintiff's missing kitten. Snyder then threatened, with his wife standing by yelling insults, "if you don't drop the suit, you'll never see your cat again."

(Id., ¶ 37). While she was "quite frightened" O'Connor reported this alleged kitten kidnapping to the police who allegedly "did nothing and opined in his report that the kitten had run away, on the encouragement of the Snyders." (Id., ¶ 38).

O'Connor further alleges that she had one other encounter with Elmer Snyder, more than one year later, at a local fast-food restaurant, where she understood Snyder to convey implicit threats against her pet puppy. This alleged encounter reprised familiar themes in O'Connor's complaint; specifically, her concern that the defendants have engaged in some longstanding, ongoing electronic surveillance of the plaintiff. As O'Connor has explained:

> 48. On December 13, 2019, approximately eighteen months since the controversy began, plaintiff was sitting in the neighborhood McDonalds facing the wall and thus did not see defendant Elmer Snyder approach. He imposed his presence on plaintiff by standing less than three feet way, until plaintiff turned around and saw him. He then, uninvited, made remarks about plaintiff's puppy, at that time outside in plaintiff's car. Snyder somehow knew the puppy's name even though,

significantly, he mispronounced it. He was, of course, signaling that persons in the neighborhood were in contact with him about plaintiff's activities and/or that he was still illegally accessing plaintiff's cell phone. His mention of seeing the dog clearly conveyed that he had approached plaintiff' s car from where he had parked in the back lot with his rig, and peered in the tinted windows with no legitimate purpose, putting plaintiff in fear that the puppy was the next target of Snyders' blackmail and theft scheme, as plaintiff recognized his deliberately accosting her to speak about the puppy was a veiled threat.

49. Plaintiff called the police after Snyder walked away, but again, the police did nothing. except to take the report.

(Id., ¶¶ 48-49).

Finally, O'Connor alleges that after these events, the defendants "continue to the present to trespass on plaintiff's property," illicit conduct which led O'Connor to sue the Snyders in state court in Maryland for trespass and conspiracy to trespass. (Id., ¶¶ 50-51). However, like her prior replevin action, this lawsuit appears to have been unavailing since the defendants have provided the court with a copy of a February 2023 order dismissing this lawsuit. (Doc. 32, Ex. 1(A)).

On the basis of these averments O'Connor has brought a federal civil RICO racketeering conspiracy case against Mr. and Mrs. Snyder, alleging that they operate as a racketeering enterprise and have engaged in theft, extortion, wire fraud, and an array of criminal acts in pursuit of their racketeering enterprise. (Id., ¶¶ 52-151). While she makes these sweeping allegations of criminality, the factual basis for her complaint remains grounded upon her claims which have been largely rejected by the state courts. Thus, at bottom, these federal RICO racketeering claims rest upon

O'Connor's perception of events relating to the alleged loss of a broken generator, her disagreement with the Snyders over horse boarding fees, and the October 2018 disappearance of her kitten. On the basis of these federal racketeering claims, O'Connor seeks damages and injunctive relief. (Doc. 7).

The defendants, who are also proceeding *pro se*, have filed a motion to dismiss this complaint. (Doc. 31). This motion is fully briefed and is, therefore, ripe for resolution.

For the reasons set forth below, the motion to dismiss will be granted.

## II.    Discussion

### A.    Motion to Dismiss – Standard of Review

A motion to dismiss tests the legal sufficiency of a complaint. It is proper for the court to dismiss a complaint in accordance with Rule 12(b)(6) of the Federal Rules of Civil Procedure only if the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). With respect to this benchmark standard for the legal sufficiency of a complaint, the United States Court of Appeals for the Third Circuit has aptly noted the evolving standards governing pleading practice in federal court, stating that:

> Standards of pleading have been in the forefront of jurisprudence in recent years. Beginning with the Supreme Court's opinion in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), continuing with our opinion in Phillips [v. County of Allegheny, 515 F.3d 224, 230 (3d Cir. 2008)], and culminating recently with the Supreme Court's decision in Ashcroft v. Iqbal, –U.S.–, 129 S. Ct. 1937 (2009), pleading standards

> have seemingly shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss.

Fowler v. UPMC Shadyside, 578 F.3d 203, 209-10 (3d Cir. 2009).

In considering whether a complaint fails to state a claim upon which relief may be granted, the court must accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom are to be construed in the light most favorable to the plaintiff. Jordan v. Fox, Rothschild, O'Brien & Frankel, Inc., 20 F.3d 1250, 1261 (3d Cir. 1994). However, a court "need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss." Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997). Additionally, a court need not "assume that a . . . plaintiff can prove facts that the . . . plaintiff has not alleged." Associated Gen. Contractors of Cal. v. California State Council of Carpenters, 459 U.S. 519, 526 (1983). As the Supreme Court held in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), in order to state a valid cause of action, a plaintiff must provide some factual grounds for relief which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of actions will not do." Id., at 555. "Factual allegations must be enough to raise a right to relief above the speculative level." Id.

In keeping with the principles of Twombly, the Supreme Court has underscored that a trial court must assess whether a complaint states facts upon

which relief can be granted when ruling on a motion to dismiss. In <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009), the Supreme Court held that, when considering a motion to dismiss, a court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." <u>Id.</u>, at 679. According to the Supreme Court, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Id.</u>, at 678. Rather, in conducting a review of the adequacy of a complaint, the Supreme Court has advised trial courts that they must:

> [B]egin by identifying pleadings that because they are no more than conclusions are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

<u>Id.</u>, at 679.

Thus, following <u>Twombly</u> and <u>Iqbal</u>, a well-pleaded complaint must contain more than mere legal labels and conclusions; it must recite factual allegations sufficient to raise the plaintiff's claimed right to relief beyond the level of mere speculation. As the United States Court of Appeals for the Third Circuit has stated:

> [A]fter <u>Iqbal</u>, when presented with a motion to dismiss for failure to state a claim, district courts should conduct a two-part analysis. First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Second, a District Court must then determine whether the facts alleged in the complaint are

> sufficient to show that the plaintiff has a "plausible claim for relief." In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to "show" such an entitlement with its facts.

Fowler, 578 F.3d at 210-11.

As the court of appeals has observed:

> The Supreme Court in Twombly set forth the "plausibility" standard for overcoming a motion to dismiss and refined this approach in Iqbal. The plausibility standard requires the complaint to allege "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570, 127 S. Ct. 1955. A complaint satisfies the plausibility standard when the factual pleadings "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949 (citing Twombly, 550 U.S. at 556, 127 S. Ct. 1955). This standard requires showing "more than a sheer possibility that a defendant has acted unlawfully." Id. A complaint which pleads facts "merely consistent with" a defendant's liability, [ ] "stops short of the line between possibility and plausibility of 'entitlement of relief.' "

Burtch v. Milberg Factors, Inc., 662 F.3d 212, 220-21 (3d Cir. 2011), cert. denied,

132 S. Ct. 1861 (2012).

In practice, consideration of the legal sufficiency of a complaint entails a

three-step analysis:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Iqbal, 129 S. Ct. at 1947. Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Id., at 1950. Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010) (quoting

Iqbal, 129 S. Ct. at 1950).

In considering a motion to dismiss, the court generally relies on the complaint,

attached exhibits, and matters of public record. Sands v. McCormick, 502 F.3d 263,

268 (3d Cir. 2007). The court may also consider "undisputedly authentic

document[s] that a defendant attached as an exhibit to a motion to dismiss if the

plaintiff's claims are based on the [attached] documents." Pension Benefit Guar.

Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993). Moreover,

"documents whose contents are alleged in the complaint and whose authenticity no

party questions, but which are not physically attached to the pleading, may be

considered." Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 560 (3d Cir.

2002); see also U.S. Express Lines, Ltd. v. Higgins, 281 F.3d 382, 388 (3d Cir. 2002)

(holding that "[a]lthough a district court may not consider matters extraneous to the

pleadings, a document integral to or explicitly relied upon in the complaint may be

considered without converting the motion to dismiss in one for summary

judgment"). However, the court may not rely on other parts of the record in

determining a motion to dismiss, or when determining whether a proposed amended

complaint is futile because it fails to state a claim upon which relief may be granted.

Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994).

These legal tenets guide us in the evaluation of the sufficiency of this complaint.

### B.   <u>The Motion to Dismiss Will Be Granted</u>

In her complaint, O'Connor alleges that her curious collection of allegations, many of which have been rejected when presented in other contexts to state courts, describe a federal RICO racketeering claim against Elmer and Lori Snyder.

Upon reflection, we disagree.

O'Connor faces exacting and precise burdens of pleading and proof when advancing federal RICO claims. As this court has observed:

> Four elements are required for a § 1962(c) claim: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." <u>Sedima, S.P.R.L. v. Imrex Co.</u>, 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). "Racketeering activity" is conduct proscribed by a number of specifically identified provisions under Title 18 of the United States Code, which include mail fraud (§ 1341) and wire fraud (§ 1343). 18 U.S.C. § 1961. A pattern of racketeering activity requires "at least two acts of racketeering activity within a 10–year period." <u>H.J. Inc. v. Northwestern Bell Telephone Co</u>., 492 U.S. 229, 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) (internal citations omitted).

<u>Wilson v. Parisi</u>, 549 F. Supp. 2d 637, 658–59 (M.D. Pa. 2008). Likewise, the elements of a civil RICO conspiracy claim are that:

> (1) Defendant is a person who conspired to violate §§ 1962(b) or (c); (2) Defendant understood the nature or unlawful character of the conspiratorial plan; (3) Defendant agreed to join with others to achieve the objective of the conspiracy during the relevant period; (4) Defendant agreed that the enterprise would be conducted through a pattern of racketeering activity. This means that the commission of at

least two predicate crimes by the conspiracy was contemplated.

Arunachalam v. Int'l Bus. Machines Corp., 243 F. Supp. 3d 526, 529–30 (D. Del. 2017), aff'd, 759 F. App'x 927 (Fed. Cir. 2019).

Furthermore, the RICO statute proscribes racketeering by an "enterprise." Therefore, to establish a RICO violation, the plaintiff must plead facts which plausibly allege the existence of some criminal enterprise. On this score:

> An " 'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "[A]n association-in-fact enterprise must have at least three structural features: [1] a purpose, [2] relationships among those associated with the enterprise, and [3] longevity sufficient to permit these associates to pursue the enterprise's purpose." Boyle v. United States, 556 U.S. 938, 946, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009). "[A]n association-in-fact enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct.' " Id. (quoting United States v. Turkette, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981)).

Irish v. Ferguson, 970 F. Supp. 2d 317, 344 (M.D. Pa. 2013).

In addition, civil RICO claims must be timely brought in order to survive. In this regard:

> The statute of limitations for RICO claims is four years. Agency Holding Corp. v. Malley-Duff & Assocs., Inc., 483 U.S. 143, 156, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). The statutory period runs from the date that Plaintiffs "knew or should have known of their injury," and "kn[ew] or should have known of the source of their injury." Prudential Ins. Co. of Am. v. U.S. Gypsum Co., 359 F.3d 226, 233 (3d Cir. 2004) (citing Forbes v. Eagleson, 228 F.3d 471, 485 (3d Cir. 2000)).

Corman v. Nationwide Life Ins. Co., 396 F. Supp. 3d 530, 547 (E.D. Pa. 2019).

Judged against these guideposts, we find that O'Connor's civil RICO claims fail on numerous grounds. At the outset, we are constrained to note that a number of O'Connor's allegations relating to aerial surveillance of her kitten by drones and years' long electronic monitoring of her whereabouts by the Snyders have the quality of matters more imagined than real. This case cannot proceed forward based solely upon these fantastic allegations. Quite the contrary, we may properly dismiss a pleading when presented with a complaint which "relies on 'fantastic or delusional scenarios.'" DeGrazia v. F.B.I., 316 F. App'x 172, 173 (3d Cir. 2009) (quoting Neitzke v. Williams, 490 U.S. 319, 328, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989)).

Beyond this threshold, fundamental shortcoming, O'Connor's civil RICO claims fail because she has not sufficiently alleged the requisite pattern of racketeering activity by a criminal enterprise. This RICO claim fails in multiple respects. First, we do not believe that the amended complaint adequately alleges that Mr. and Mrs. Snyder are, in fact, a racketeering "enterprise" as that term is defined by RICO. In any event, we find that O'Connor has not sufficiently alleged a pattern of racketeering activity on the part of the Snyders. On this score, stripped to its essentials, the factual lynchpin of this RICO claim rests upon four allegations; namely: (1) O'Connor's claim that the defendants failed to return a broken generator to her which they had removed in early 2018; (2) O'Conner's equine boarding fees dispute with the Snyders, a matter which has been thoroughly and unsuccessfully

litigated by O'Connor in state court; (3) O'Connor's allegations that Mr. and Mrs. Snyder are kitten kidnappers; and (4) O'Connor's other miscellaneous trespass claims, which were dismissed by the state courts in Maryland.

In our view these factual averments, the pillars upon which this RICO claim rests, are upon inspection pillars of sand which collapse under close scrutiny. For example, O'Connor's claims regarding her lost, broken generator and the return of the animals she was boarding with the Snyders, all entail matters which took place in early to mid-2018, more than four years prior to the filing of this RICO case in October of 2022. Further, as described by O'Connor, these events had the type of criminal clarity which would have required her to timely file her RICO claim within the four years limitation period prescribed by law. Yet, it is undisputed that O'Connor has failed to timely pursue these particular claims which pre-date October 2018.

Additionally, the doctrine of *res judicata* further undermines these pillars of O'Connor's RICO claim since her allegations relating to the Snyders' wrongful retention of her horses, as well as her claims concerns alleged trespasses by the defendants, have been considered and rejected by the state courts in Pennsylvania and Maryland. This too is a fatal flaw in this pleading since in federal practice it is well settled that *res judicata* or:

Claim preclusion bars suit when three elements are present: "(1) a final
judgment on the merits in a prior suit involving (2) the same parties or
their privies and (3) a subsequent suit based on the same cause of
action." Lubrizol Corp. v. Exxon Corp., 929 F.2d 960, 963 (3d Cir.
1991). In evaluating whether those elements exist, we do not proceed
mechanically, "but focus on the central purpose of the doctrine, to
require a plaintiff to present all claims arising out of the same
occurrence in a single suit. In so doing, we avoid piecemeal litigation
and conserve judicial resources." Blunt v. Lower Merion Sch. Dist., 767
F.3d 247, 277 (3d Cir. 2014) (internal quotation marks and brackets
omitted), cert. denied, —— U.S. ——, 135 S.Ct. 1738, 191 L.Ed.2d 702
(2015). "The purpose of *res judicata* is to 'relieve parties of the cost
and vexation of multiple lawsuits, conserve judicial resources, and, by
preventing inconsistent decisions, encourage reliance on adjudication.'
"

Davis v. Wells Fargo, 824 F.3d 333, 341–42 (3d Cir. 2016).

Likewise in state practice:

For *res judicata* to apply, Pennsylvania courts require that the two
actions share the following four conditions: (1) identity of the thing
sued upon or for; (2) identity of the cause of action; (3) identity of the
persons and parties or their privies to the action; and (4) identity of the
capacity of the parties to sue or be sued. R & J Holding Co. v.
Redevelopment Auth., 670 F.3d 420, 427 (3d Cir. 2011) (citing Bearoff
v. Bearoff Bros., Inc., 458 Pa. 494, 327 A.2d 72, 74 (1974) ). The party
asserting a bar under res judicata bears the burden of showing that it
applies. Davis v. U.S. Steel Supply, 688 F.2d 166, 170 (3d Cir. 1982)
(en banc).

Estate of Tyler ex rel. Floyd v. Grossman, 108 F.Supp.3d 279, 290 (E.D. Pa. 2015).

See Farkas v. Rich Coast Corp., No. 1:14-CV-272, 2017 WL 10299096, at *4–5

(M.D. Pa. May 19, 2017), report and recommendation adopted, No. 1:14-CV-272,

2017 WL 10299208 (M.D. Pa. Aug. 17, 2017).

In the instant case, it is undisputed that O'Connor's claims regarding her right to possess the horses she boarded with the defendants have been repeatedly rejected by the state courts, which have dismissed her replevin claim, entered judgment in favor of the Snyders on the boarding fees dispute, and affirmed O'Connor's trespass conviction rejecting her defense that she had a right to enter the Snyders' property to visit her horses and look for her kitten. These findings are *res judicata*, and in our view, now preclude any claim by O'Connor that the defendants wrongfully possessed these horses. Likewise, the Maryland state courts have dismissed the trespassing and trespassing conspiracy claims that O'Connor levelled against Elmer and Lori Snyder. This state court determination also constitutes *res judicata* with respect to any federal RICO claims premised upon illicit trespassing by the defendants.

Finally, with respect to O'Connor's largely speculative kitten kidnapping claim, in our view this averment, standing alone, simply cannot meet the statutory elements of a federal civil RICO lawsuit. Simply put, a missing kitten, an equine boarding fees dispute, and the failure to return a broken generator, do not a RICO racketeering case make. Nor can O'Connor cobble together a federal racketeering case based upon factual averments which have been rejected by the state courts in other related litigation. Therefore, finding that O'Conner's claims all fail as a matter of law, this complaint will be dismissed.

An appropriate order follows.



*S/Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: September 19, 2023